144　　　　　　SUPREME COURT.

Linton vs. Walkor et al.—Statement of Case.

THOMAS J. LINTON, APPELLANT, VS. HAMILTON K., MARY H. AND MINOR W. WALKER, APPELLEES.

1. A payment to a father as natural guardian for a child, is not valid as a defence to an action for recovery of the hires of negroes belonging to the child.

2. Nor will a plea be good as a defence that the father, being for a long time in possession of the child's negroes, hired them to defendant and had received the payment therefor.

3. An action of assumpsit is not maintainable by a ward against his guardian, or quasi guardian, the parent. The remedy is by action of account or bill in equity, in which the equities between the parties may be adjusted and rightfully settled.

This case was decided at Tallahassee.

On the 2d day of April, 1856, the appellees, the children of Minor Walker, who are minors, instituted an action of assumpsit in Jefferson Circuit Court against the appellant, to recover the hires of fifteen negro slaves for five years, from 1850 to 1855.

The appellant pleaded:

1st. *Non assumpsit.*

2d. Payment to the father of the plaintiffs, as natural guardian, of a large sum in full satisfaction.

The plaintiffs joined issue on the first and demurred to the second pleaed, which demurrer was sustained by the Court.

Defendant then pleaded payment generally and also specially:

"That one Minor Walker, who was and had for a long time before been in possession of the said slaves, in the declaration mentioned, claiming and exercising ownership thereof, and without any notice or knowledge by this defendant that the plaintiffs had or claimed any title to said

negroes, did, on the first day of January, A. D., 1850, hire the said negro slaves in the declaration mentioned to this defendant for five years from the first day of January, A. D., 1850, for the sum of six thousand dollars, in equal annual instalments, falling due and payable on the first day of January in the years 1851, 1852, 1853, 1854 and 1855 respectively, each instalment being for the sum of twelve hundred dollars. And defendant avers and in fact saith, that before the institution of this suit, and before he had any notice or knowledge that the said plaintiffs had or claimed title to said slaves, and before they made any claim to said slaves in said declaration mentioned, he, the said defendant, fully paid to the said Minor Walker the said sum of six thousand dollars, for the hire of said slaves in manner aforesaid, according to the said agreement of hiring."

Plaintiffs joined issue to the plea of payment and demurred to the special plea, alleging as grounds of demurrer:

1st. That the plea charges payment to Miner Walker and not to plaintiffs.

2nd. It does not allege that the said Walker was authorized to grant acquittances and discharges, and that he did acquit and discharge the defendant.

3rd. That the plea is no answer to the action, is double, is not triable, is irregular and insufficient.

The Court below sustained the demurrer and defendant excepted.

On the trial the plaintiffs offered and read in evidence the record of the will of Jacqueline Peterson, decd., late of Hancock County, Georgia, admitted to probate 4th May, 1829, in which he lends to his daughter, Martha Peterson, who afterwards intermarried with Minor Walker, certain

146 SUPREME COURT.

Linton vs. Walker et al.—Statement of Case.

property, "until she may marry and have a lawful child, and in that event of her having and leaving at her death a child or children, he gives and bequeathes unto such child or children the same property absolutely."

Plaintiffs also offered and read in evidence a receipt of Minor Walker, then the husband of Martha Peterson, dated 9th February, 1837, in which he acknowledges to have received from the administrator of Jacqueline Peterson certain named negroes, which he declares were all that he was entitled to under the will of J. Peterson.

Henry L. Taylor, a witness for plaintiffs, testified that he knew Minor Walker in 1832—that said Walker married in 1833 Martha Peterson, daughter of Jacqueline Peterson —that he had no negroes of his own at that time—that he knew several of the negroes mentioned in the declaration, and knew that negroes by the names of the others were left by the will of Jacqueline Peterson to his daughter Martha. Has seen the negroes within a day or two, and is satisfied from their ages, family resemblances, &c., that they are the same negroes left by said will. Has seen the negroes named in the possession of Minor Walker in Hancock county.

Charles G. English, another witness for plaintiffs, testified that previously to first of January, 1852, he held repeated conversations with H. L. Linton and Thomas J. Linton, respecting the mortgage of Minor Walker to the Union Bank. By one or the other of them, and his impression was by both, he was informed that there was a report that the slaves mortgaged by said Walker to the Bank were the property of his children. Neither of them told witness such was the case as of his own knowledge; and up to that time witness had never heard the report that they were the property of Walker's children from any other source.

William Butler, another witness for the plaintiffs, testified that Linton, at the time he was making a bargain with Minor Walker for the hire of certain negroes in controversy, told him, witness, that the negroes he was about to hire did not belong to Minor Walker, but to his children. This was some time in 1849, and only a short time before he hired the negroes. Linton was speaking at the time of the good bargain he had made with Walker, and the cheapness of the price he was to pay for the hires. The negroes were in the possession of Minor Walker at the time.

William Denham, another witness for the plaintiffs, testified that in the year 185–, Linton told him that he wanted to get Minor Walker entirely out of the Union Bank, and that the Bank would not release his land unless the whole debt was paid, because they believed their mortgage on the Walker negroes was not worth any thing; that the negroes referred to are the same negroes hired by Thomas J. Linton from Minor Walker—that Walker exercised acts of ownership over the negroes until Dr. Palmer took out letters of guardianship of the children of said Walker—that about the year 1843, Mrs. Byrd proposed to purchase a negro from Walker, who told her she had better not, for his title would not be good, but that he, witness, did not believe what Walker said, as he, witness, thought Walker was only trying to put Mrs. Byrd off in the payment of what he was indebted to her; that Walker hired out said negroes to W. N. Taylor for the year 1855, and collected the hire for the same.

It was admitted that Mrs. Walker, the mother of the plaintiffs, had died before the year 1850.

The defendant, to sustain the issue on his part, offered and read in evidence an indenture, entered into between Minor Walker and Thomas J. Linton, dated the first day of January, 1850, and recorded 2d April, 1850, whereby

said Walker conveyed to said Linton certain lands mort-
gaged by said Walker to the Union Bank of Florida, for
the consideration of six thousand five hundred dollars, a
sufficient amount of which was to be applied by said Lin-
ton towards the payment of the debt to the Bank and the
removing the incumbrance, and the balance to be paid to
said Walker. The said indenture also contained the fol-
lowing agreement of hiring of the negro slaves named in
the declaration, viz :

"This indenture also witnesseth, that the said party of
the first part hath hired and delivered, and doth by these
presents hire and deliver to the party of the second part,
fifteen negro slaves of the names following, to wit : Abed-
nego, Meshack, Allen, Monroe, Starling, Drew, Major,
Winney, Caroline, Nancy, Cheney, Mary and Silla : To
have, hold, use and enjoy to him, his executors and ad-
ministrators, for the period of five years next ensuing the
date hereof; and in consideration of said hiring and de-
livery, the said party of the second part agrees and hereby
covenants to pay to said party of the first part the sum of
six thousand dollars, in five equal annual instalments, fall-
ing due and payable on the first day of January in the
years 1851, 1852, 1853, 1854 and 1855 respectively, each
instalment being for the sum of twelve hundred dollars.
And the said party of the second part further covenants to
treat said slaves kindly and to supply them with the usual
amount of food and clothing, and on the first day of Janu-
ary, 1855, *to return such of them as shall be alive, with
the increase of the females, to the said party of the first
part.*"

The defendant also read in evidence a bill in chancery,
filed by said Linton after the termination of the hiring,
against Minor Walker and Denham & Palmer, and the
answers thereto, growing out of the said agreement of

hiring, alleging a settlement and payment of all the instalments for the hires of said negroes, except the last, which had been transferred to Denham & Palmer, and as to this last claiming a set-off and payment, and that he should be credited therewith against the last instalment in the hands of Denham & Palmer.

The answer of Denham & Palmer admits that said Minor Walker, at the time of filing the same in November, 1855, had control of the negroes formerly hired to Linton, and that he had hired them out for that year. They also admit that the note for the last instalment of the hiring was transferred to them by Minor Walker.

Minor Walker, in his answer to said bill of complaint, admits the execution of said indenture, and that he delivered to said Linton the negroes hired by him, and also admits the settlement by Linton of all the instalments for the hiring except the last one, which fell due in January, 1855.

The defendant also read in evidence the record of a mortgage executed by Minor Walker to the Union Bank, dated 10th May, 1838, mortgaging the negroes hired to Linton and named in the declaration.

The defendant offered to read in evidence the statement of C. G. Fife, taken by consent, to be used in evidence, if admissible, in which said Fife declares that Minor Walker, in 1850, desiring to go in business with witness, stated that he had hired *his* negroes to Linton, and that from the hires he could raise funds to commence with.

In 1855 witness was employed by Linton to collect two judgments he held against Walker. Witness stated that he thought it a poor chance. Linton urged a levy on Walker's negroes in Jefferson county. Witness told him that he had heard the rumor that the negroes were the property of Walker's children. Linton replied he did not

believe it, nor did he believe it until an authenticated copy of the will and proceedings of the Court from Georgia was obtained by the claimant of the property levied on. This, witness thinks, was in the year 1856; and upon witness exhibiting this copy of the will, Linton manifested surprise, and said he never believed it before.

The Court below ruled out the statement of said Fife as irrelevant, and defendant excepted.

Under an agreement to waive a jury, the Court below gave judgment for the plaintiffs, with a writ of enquiry to assess the damages, and defendant appealed.

*Archer & Papy* for appellant.

*W. S. Dilworth & B. C. Pope* for appellees.

BALTZELL, C. J.

This is a suit of the infant children and heirs of the late Mrs. Minor Walker, claiming of the appellant, Linton, the hire of fifteen slaves which they own through a legacy from their grandfather, Jacqueline Peterson, who, in the year 1824, made his will in Hancock, Georgia, giving this and other property to his daughter Martha, their mother, and after her death to her children. Minor Walker intermarried with her, and by this means became possessed in 1837 of her property. On the first of January, 1850, he hired the negroes to Linton for a term of five years, and has received all, or the larger portion of the price agreed to be paid. Mrs. Walker died previously to the year 1850. The right of the children to the negroes is not contested. The present suit is through their guardian to obtain the amount due for the hire, insisting that the payment to their father was not valid.

Two pleas filed in the Court below, and adjudged insuffi-

cient, present the question raised for consideration in this Court.

The first sets up the payment to the father of the plaintiffs, as their natural guardian, of a large sum in full discharge of this hiring, and that plaintiffs, by their natural guardian, received said sum in full satisfaction, &c.

It is too well settled to admit of question that such a payment is not an acquittance nor satisfaction.

The true doctrine on this subject will be found in the recent editions of Blackstone to this effect : " Guardianship by nature confers no right to intermeddle with the property of the infant, but is a mere personal right to the custody of the *person* of his heir."—1 Black. Com. p. 460, n. 1.

And so in the American elementary works—2 Kent. Com. 217 ; 1 Bouv. Inst. 139. The American Courts hold in like manner, though in language somewhat differing, " A guardian by nature has no control over the property, real or personal, of his child ; he is not entitled to the personal estate of his ward." " A payment to him on account of the child is no payment."—1 John. Chy. 3 ; 7 Cowen, 38 ; 7 Wend. 354 ; 15 Wend. 631 ; 2 Mass. 55 ; 3 Pick. 213 ; 2 Hill, (S. Car.) 288 ; 5 Porter, (Ala.) 385 ; Walker, (Miss.) 49 ; 9 Wend. 504 ; 9 B. Mon. 324, (Ky.) The defence set up in this plea then is clearly untenable.

The other plea abandons the ground of guardianship of the father and all right proceeding from that relation, alleging " that Minor Walker, *for a long time, having been in possession* of the said negroes, hired them to defendant—that defendant had no notice of plaintiffs' right, and that he has paid and satisfied Walker." Very clearly this presents no defence ; it alledges no right but that of past possession, which of itself gives none. For if it did, the possessor for one year, by hiring, might put up claim for the second year on this account. In the very case before us,

Minor Walker had right, through his intermarriage and the life tenancy of his wife, to the negroes, up to 1850, but he had no greater right after that time than his children had to the period preceding her death, before their right accrued. Nor does the want of notice strengthen the claim of Linton to the negroes, or exempt him from payment to the true owner. The children are as much owners without such knowledge as with it. No proposition is clearer than that the owner alone has the right to hire his property, nor is he less owner that his rights are unknown. As far as the true owner is concerned, it is the *risk* of the hirer that he deals with one having no right nor authority. Bargaining with such a one, the hirer gets what such person could assign or convey to him, and if the latter had no interest nor authority he could convey none. There is just as much reason for holding that Linton could hold the negroes against a demand of the children, properly made, as for claiming the payment made by him as a lawful acquittance. The defence under this plea also we regard as untenable.

Whilst the merits are so clearly with plaintiffs, an objection yet remains of no slight delicacy and importance. Defendant insists that a Court of Chancery is the proper forum for the adjudication of the case, and that an action of assumpsit, the remedy adopted here, is not maintainable. The plaintiffs' demurrer to defendant's pleas raises this question, it being an established rule that such pleading "lays open to the Court, not only the pleading demurred to, but the entire record, so that the Court will give judgment against the party committing the first fault in substance; and if the declaration be bad, there shall be judgment against the plaintiffs, though the bar be also insufficient."—Arch. Ple. & Ev. 314–15; 1 Chitty, 647; 1 Florida, 132.

That a suit in Chancery was the appropriate remedy, we think admits not of a doubt. Blackstone in his 3rd vol., speaking of the remedies for wrongs in this relation, says : " A more speedy and summary method of redressing all complaints relating to guardians and wards, hath of late obtained by an application to a Court of Chancery, which is the supreme guardian, and has the superintendent jurisdiction of all the infants of the Kingdom."—3 Black. 141–2.

" A Court of Chancery will exercise a vigilant care over guardians in their management of the property of the infant. It will carry its aid and protection in favor of infants to reach other persons than those who are guardians, strictly appointed ; for, if a man intrudes upon the estate of an infant and takes the profits thereof, he will be treated as guardian and held responsible therefor to the infant in a Court of Equity."—2 Story's Equity, 585 ; Morgan vs. Morgan, Atk., 489.

The American reports are full to the same effect. " The father receiving property of an infant, will be held liable to the same extent as if regularly appointed."—4 Paige, 64.

" A person acting as guardian is subject to the responsibility of guardian." This was the case of an uncle.—5 B. Monroe, 362 ; 1 *Ib.*, 183.

" The allowance to guardians, and those who act as *quasi* guardians, for support, maintenance and education of children, is limited to the amount of income from rent and hires of the estate, except under peculiar circumstances." Jackson vs. Jackson, 1 Grat., 143.

" Where a mother, on the death of her husband, took possession of the estate, and managed it, and maintained the children out of the income, she was allowed for their

past and present maintenance."—Wilkes vs. Rogers, 6 John., 566.

"A parent will not be compelled to account for hire of a slave held by him in indigent circumstances, when the services of the slave were in support of the ward."—1 B. Mon., 187.

"Where the father or mother is in distress or narrow circumstances, a maintenance or provision will be allowed out of the estate of their child."—2 Story's Equity, 584.

See also authorities collected in Osborne vs. VanHorn, 2 Florida Rep., 362—a case very near, in its leading facts, like that decided by the Supreme Court of New York in the days of Kent and Spencer, being the case quoted above as 6 John., 566.

It will be thus seen that chancery, whilst admitting the rule of the invalidity of a payment to a parent as natural guardian to its full extent, yet moderates its sternness and severity in deference to natural ties and the dictates of a generous nature, by allowing to parents, other relatives, and even to strangers, payments or disbursements made in good faith to and for the child—in some instances even giving a maintenance from the child's fortunes when the parent is in reduced circumstances.

Whilst, then, a bill in equity is the appropriate remedy, the question remains whether an action of assumpsit may not also be maintained.

Account was the old remedy, but has become obsolete· It lay against a *quasi* guardian, as a parent, who receives the profits of his child's land, and also in like manner. against a stranger as guardian.—1 Com. Dig., Acct., A. 2, page 188. He shall not be charged as receiver, for a receiver shall not be allowed his expenses as a guardian· shall.—*Ibid.*; Co. Litt., 172a.

"In account, the judgment against defendant was *quod*

*computet,* that he make his account, and auditors were assigned, usually two officers of the Court, who were to assign a. day, and defendant was to appear from day to day till the account was finished. The defendant could plead that he has expended for plaintiff's maintenance— that he had lost by inevitable accident, and he shall be allowed all reasonable accounts and expenses in all things." 1 Com.. Dig., Acct., E. 7, 8, 11, 12; 1 Arch. *Nisi Prius,* 198–199.

It is insisted by plaintiffs, that assumpsit is the substitute for the action of account in the present case. For this we have a reference to Archbold's *Nisi Prius,* yet it does not bear out the position. The authority is, that " where a man receives several sums of money on account of another, he may bring assumpsit or debt, or he may have an action of. account." Under the head of action of account, the same learned author says : " If a man receive money belonging to another and render an account of it, the remedy for the balance due by him is by assumpsit or debt. But if he refuse to render an account of the money received by him, and the owner have no evidence of the receipt, the only mode of compelling him in a court of law to render an account and pay over the balance, is by action of account. The action must be brought against the defendant as receiver or as guardian."—1 Arch., 196.

In all cases where evidence can be given of the receipt *of money,* assumpsit or debt is substituted ; and in all cases where assumpsit or debt will not lie, it is usual now, instead of bringing an action of account, to *file a bill for an account in a court of equity.* This is perhaps to be regretted, for in many cases the action would be as satisfactory a remedy, and much more expeditious and less expensive.—1 Arch. *Nisi Prius,* 197.

The action of assumpsit is so unsuited to cases of this

nature, as to require very strong authority to induce the belief that it is applicable to them. In the trial by the action of account, the judgment is that defendant make an account as guardian. There is none such in assumpsit; and the matters depending between the parties are obviously of a nature to require an account, being such as is usually settled by a Judge of Probate for sums paid for boarding, schooling, clothing, physician's bills, hire of engroes, paying taxes, &c., all requiring nice and careful calculation and the patience of days to comprehend and adjust with reasonable certainty. In this case, the account of Linton may be of this very character, ranging over a period of five years. If he is entitled to such payments and credits as are usually allowed, then there should be such an account. To submit a case of such character, with its numerous items, to a jury, with a reasonable hope of attaining a certain and just result, would scarcely be wise or proper. Hence it is we see the provision for the action of account with auditors, and a court of chancery with its master. We perceive, also, that the action of assumpsit does not lie and may not be maintained by a ward against a guardian.—19 John., 304.

It is not a little remarkable in this connection that the authorities declaring the rights of infants associate the remedy thus: "*Account* lies against a stranger as guardian, who enters and receives the profits."—1 Com. Dig., 187. "Such persons will be held responsible therefor to the infant *in a court of equity*."—See cases quoted above. Now, why this declaration, if the right and the remedy existed as in other cases? We will add, that in all our investigations, we have not been able to find the instance of the action of assumpsit applied to the circumstances of the present case.

It is urged again by plaintiffs, that the defendant being

a trespasser, they may waive the wrong and sue in assumpsit. The authorities cited have been examined with every care, but they fail to satisfy us. We are not disposed to deny that they may apply to cases in which the parties labor under no disability. We are relieved from a minute examination of these by the very conclusive authority of the case of Sherman vs. Ballou, in the Supreme Court of New York. There the effort was to get a set-off for rents received and due to an infant. The objection to it was that it was not matter of set-off, the parties not being suable in assumpsit. The Court say, "the plaintiff never had any authority to dispose of the defendant's property, nor as his guardian nor agent of his guardian, to receive the rents and profits, the letters of guardianship being void and his interference tortious. If a man who has no title to be guardian enters as guardian into the lands of an infant, it is at the election of the infant to make him a disseisor, or *else to dissemble the wrong and call him to account as guardian.*"—Bac. Ab., Guard., 1.

" If the defendant chose to waive the tort, then the plaintiff *must be called to account* as guardian, and *the remedy is in chancery,* or by action in account."—1 Mad., 262; 19 John., 304; Sherman vs. Ballou, 8 Cowen, 307.

So we think here that the plaintiffs' remedy is by bill in equity, and that the action of assumpsit is not maintainable. In coming to this conclusion, it is gratifying to find that the decision will be conducive to right and justice in the end.

It is very clear from the evidence, that the defendant is entitled to credits, and these should be ascertained before a judgment is pronounced against him. The counsel for plaintiffs proffered, on the mention of these, to allow whatever was rightful and proper, but it does not comport with either justice or propriety to leave the rights of contest-

ing parties dependent upon the liberality of an adversary. Far better the remedy in every instance which shall adjust and determine all the matters in contest between the parties, and leave none of them to future decision or controversy. The judgment will then be, as it ought to be, for the true amount due.

The judgment of the Court below will be reversed and set aside, and the cause remanded, with directions to that Court to enter judgment on the demurrer for want of the proper action being instituted by plaintiffs, the remedy of the plaintiffs being a court of chancery, to which they are referred.

DuPONT, J.

I concur in the judgment of reversal pronounced in this case, and it having been decided that the plaintiffs are not properly in Court, I think that there is an impropriety in passing upon the merits of the controversy. I desire, therefore, to have it noted that I am not committed to the views expressed by the C. J. upon this point, and shall reserve my opinion upon the merits of the case until the parties may come properly before us.

PEARSON, J., dissenting :

I might perhaps concur with the Court in all the points laid down in the syllabus to this cause, could I under the evidence adduced consider this an action brought by wards against a gurdian, or *quasi* guardian. But I cannot look upon the appellant (Linton) in any other light than as a *wrong-doer*—that is to say, charged with keeping, using and working, for his own benefit, negroes of another, without any lawful authority and in no way claiming or pretending to act for said minors or for their benefit.

If it be good law, that said Minor Walker, as guardian

Linton vs. Walker et al.—Dissenting Opinion.

by nature, had no control over the property real or personal of his said children, and the payment to him on account of the children was no payment, and that the said Linton could not hold the negroes against a demand of the children properly made, then he has been declared a wrong-doer by this Court in wrongfully applying the labor and work of said negroes to his own use.

A parent cannot sue for the property of the child. Yet there cannot be a doubt but that these children, after the death of their mother, at any time, while these negroes were in the possession of said Linton, could have brought (after demand and refusal,) trover for them, or could have brought replevin, alleging an unlawful detainer, and recover under our statute damages for their detention.

If then the plaintiffs could have, while the negroes were in possession of said Linton, waived their action of trover or replevin, and treated the said Linton as their agent, in receiving hires of said negroes, and brought action of assumpsit, why not now look upon him in the same way, and recover the hires in an action for money had and received, or in an action for the work and labor of said slaves? Tugman v. Hopkins, Manning & Graves, p. 389.

The principles on which the action for money had and received may be maintained, are these:

1st. Whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by the ties of natural justice and equity to refund.

2nd. In the case of an agent, where such agent is not notoriously the mere carrier or instrument for transferring the fund, but has the power of retaining, and before he has paid over, has received notice of the plaintiff's claim and a warning not to part with the fund.

3rd. Where there exists a privity between the plaintiff and the defendant.

If the declaration in this cause contained a count for money had and received, there would be no difficulty under the evidence in bringing the claim of the plaintiffs within some or all of the above principles.

The question then is, whether assumpsit for work and labor of these negroes wrongfully held can be maintained?

In Greenleaf on Evidence, vol. 2, §108, it is laid down: "If one commit a tort on the goods of another, by which he gains a pecuniary benefit, as if he wrongfully takes the goods and sells them, or *otherwise applies them to his own use*, the owner may waive the tort, and charge him in assumpsit on the common counts."

This rule has been further applied so as to entitle the plaintiff to recover for the *beneficial* use of the things taken.—1 N. Hamp. 451; 5 Greenleaf, 323; 2 Gill & Johnson, 326.

A master may sue a person who has enticed away or harbored his apprentices or slaves, in *assumpsit*, for the work and labor of said apprentices or slaves. 1 Chitty on Pleading, 94, 103; Lightly v. Clouston, 1 Taunton, 112; Foster v. Stewart, 3 M. & S., 191; Miller v. Miller, 7 Pick. 133.

That the privity between the parties is established seems clear, else payment to said Walker (the father,) would have been good.

Where the defendant, as in this case, retains in his possession slaves belonging to another, for whose use, hires, and labor he ought in justice to pay, and it appears that they did work for him, the law as I understand it presumes he promised to do so. Cook v. Husted, 12 Johnson, 188.

Again, why have not the plaintiffs a right to accept the

promise for hire made with their said father, as having been made for their benefit, particularly when it appears that Mr. Linton, the appellant, knew the negroes were the property of the said plaintiffs?

If there is no privity between the parties in this suit, then an action of account will not be maintained, because privity is essential to such an action. 2 Greenleaf on Evidence, § 35. Bill in equity will not lie for torts unless under peculiar circumstances.

Suppose there is beyond a doubt a jurisdiction in the Court of Chancery in this cause, it does not follow that a Court of law has not also jurisdiction.

Had the appellant filed a bill in Chancery, or were he now to file one, claiming and setting forth that the money arising from the hires of these negroes, in whole or in part, were and had been appropriated by the father for the benefit of these children, and asking to be subrogated to that claim of set-off, I have no doubt a Court of Chancery would grant the relief prayed. It certainly would present a strong case for such a remedy.

For these reasons, I differ with the Court in their judgment of reversal.